IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| ARSENIO PELAYO, FRANCIS MANANKIL, and BRANDON BORELIZ, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>    vs.<br><br>PLATINUM LIMOUSINE SERVICES, INC., KURT TSUNEYOSHI, *et al.*<br><br>      Defendants. | CIVIL NO. 15-00023 DKW-BMK<br><br><br>ORDER (1) DENYING PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A COLLECTIVE AND FOR AN ORDER OF NOTICE TO THE CLASS; AND (2) GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION |

**ORDER (1) DENYING PLAINTIFFS' MOTION TO CONDITIONALLY CERTIFY A COLLECTIVE AND FOR AN ORDER OF NOTICE TO THE CLASS; AND (2) GRANTING DEFENDANTS' <u>MOTION TO COMPEL ARBITRATION</u>**

## <u>INTRODUCTION</u>

Plaintiffs, former employees of Defendant Platinum Limousine Services, allege that Platinum failed to pay wages and expenses required by federal and state law. They move under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §216(b), and Section 388-11(a) of the Hawaii Revised Statutes ("HRS") for an order conditionally certifying a collective and authorizing facilitated notice to all

persons employed or formerly employed by Platinum within the three years preceding this action, who did not receive full compensation under the FLSA. Plaintiffs also request to serve as designated representatives pursuant to HRS §388-11(a) and for an order authorizing facilitated notice to all persons employed or formerly employed by Platinum within the six years preceding the complaint in this action, whose earned wages were retained in violation of Section 388-6. Because the members of the proposed collective are not sufficiently similarly situated, Plaintiffs' motion is DENIED, as set forth below.

Platinum, for its part, seeks to compel arbitration with some, but not all, Plaintiffs.  Because there is no dispute that several former employees signed written agreements that subject the claims asserted here to arbitration, and because the issue of arbitrability is for the arbitrator to decide, Platinum's motion to compel arbitration is GRANTED.

The Court will hold the parties' pending cross-motions for partial summary judgment in abeyance until a further settlement conference, directed by a concurrently filed Entering Order, is held before the Magistrate Judge.

2

# BACKGROUND

## I.   Allegations in the Second Amended Complaint

According to Plaintiffs, Platinum employed each of them as limousine drivers. Platinum employed Arsenio Pelayo from January 2012 until November 2013, Francis Manankil from approximately 2006 until January 2015, and Brandon Boreliz for approximately one month in 2012. Complaint ¶¶ 6-8.

As limousine drivers, Plaintiffs were paid by the hour, not by the job. They allege that Platinum "at least implicitly promised" that it would "comply with applicable law in paying wages and reimbursing expenses," and that "Plaintiffs relied on that implicit agreement and continued to provide their services, *i.e.*, transporting Defendants' customers as directed by Defendants and/or related services, to the benefit of Defendants and in reliance on that implicit agreement." Complaint ¶ 29. Plaintiffs allege they were not paid the amounts required by law or "as at least implicitly promised by Defendants." *Id.*

According to Plaintiffs, Defendant Kurt Tsuneyoshi owned and operated Platinum, and created and implemented "company-wide policies and procedures," including "refusing to pay Plaintiffs and those similarly situated" -

> required overtime wages; for cleaning Platinum vehicles; for driving from one customer drop-off to the next customer pickup; for driving from the last customer drop-off to Platinum;

3

for taking Platinum vehicles to service facilities for gas and/or maintenance; and/or for expenses incurred as required by Defendants. These policies were communicated to Platinum employees orally by Defendant Tsuneyoshi and/or Platinum's manager "Fred", who together supervised Plaintiffs and collective members.

Complaint ¶ 24.

Plaintiffs allege they were not paid as required by law when they were required to report early for duty at Platinum's facility in order to clean Platinum's vehicles before departing to pick up their first customer of the day. These and other mandatory tasks and meetings could take several hours each day, but Plaintiffs "were not paid any wages or otherwise compensated for this required work." Complaint ¶ 30. Thereafter, once the first customer was transported to his or her destination, Plaintiffs were required to report to the location of the next scheduled customer pickup, and then wait for the customer, sometimes for several hours. This process of waiting for the next scheduled customer pickup continued throughout the work day, and Plaintiffs allege they were not compensated for this waiting time, even though they were not completely relieved of their duties and could not effectively use the time for personal purposes. Complaint ¶¶ 31-32.

Plaintiffs allege that, after dropping off their last customer each day, drivers were expected to deliver the Platinum vehicles back to the Platinum facility and to

clean the vehicles.  These tasks could also take several hours, but Plaintiffs were not paid any wages or otherwise compensated for this required work.  Complaint ¶¶ 33.  In this way, limousine drivers were denied minimum, regular and overtime wages.   Complaint ¶ 34.  Plaintiffs were also not paid for time spent attending required monthly meetings held by Platinum supervisors.  Complaint ¶ 35. Overtime wages were allegedly not paid to Plaintiffs, who were regularly required to work over forty hours in any given workweek.  Platinum began paying overtime to employees only in 2014 in response to a Department of Labor investigation of Platinum's labor practices.  Complaint ¶ 37.

In addition to the non-payment of wages, Plaintiffs allege that certain expenses were not reimbursed by Platinum.  For example, Plaintiffs allege that Defendants required limousine drivers to provide bottled water to customers without reimbursement.  Tsuneyoshi purchased cases of water and required Plaintiffs to either purchase the water at a higher price from him or supply their own water for Platinum's customers.   Boreliz also alleges that he was not reimbursed for a gas expense.  Complaint ¶ 35.

Plaintiffs allege that, during relevant time periods, Platinum had a "consistent policy and practice" of:

a.  Willfully failing to pay time and a half overtime wages for hours worked over forty (40) per 7-day work week in violation of the FLSA and Hawaii Revised Statutes, sections 388-2, and/or 388-6;

b.  Willfully failing to pay minimum, regular or overtime wages for hours worked while driving Platinum vehicles to their first job of the workday and/or returning from the last assignment of the workday, in violation of the FLSA and the Hawaii Revised Statutes, sections 388-2, and/or 388-6;

c.  Willfully failing to pay minimum, regular or overtime wages for hours worked between the transportation of Platinum's customers in violation of the FLSA and the Hawaii Revised Statutes, sections 388-2, and/or 388-6;

d.  Willfully failing to pay minimum, regular or overtime wages for hours worked cleaning Platinum vehicles, activities required by Defendant Platinum, in violation of the FLSA and the Hawaii Revised Statutes, sections 388-2, and/or 388-6;

e.  Willfully failing to pay minimum, regular or overtime wages for hours worked participating in required meetings, in violation of the FLSA and the Hawaii Revised Statutes, sections 388-2, and/or 388-6;

f.  Willfully causing employees to incur expenses on Platinum's behalf solely for the benefit of Platinum and willfully failing to reimburse those expenses in violation of the FLSA (29 C.F.R. § 778.217) and the Hawaii Revised Statutes, sections 388-2, and/or 388-6;

g.  Willfully converting employees' wages and/or unreimbursed expenses for their own use; and

h.  Willfully causing and/or failing to prevent the unlawful labor conditions despite having the power to do so.

Complaint ¶ 18.

The following causes of action remain: (1) violation of HRS § 388-6 for failure to timely pay wages due (Count 1); (2) unjust enrichment (Count 3); and (3) violations of the FLSA, 29 U.S.C. §§ 201 *et seq*. (Count 4).

## II.   **Motions Before the Court**

Pelayo, Manankil, Boreliz, and proposed class member plaintiffs seek certification of a collective action pursuant to the FLSA and HRS Chapter 388. Their proposed collective is composed of between twenty (20) and fifty (50) current and former employees of Platinum in the State of Hawaii.

Under the FLSA, the collective includes:

> All non-exempt employees of Defendant Platinum who within the three (3) years preceding the filing of the Complaint in this action:  (a) actually worked more than 40 hours in any given workweek and did not receive time and a half pay for overtime hours; (b) received less than $7.25 average hourly rate for work performed during any given workweek.

Under the HRS, the class is defined as:

> All persons employed by Defendant Platinum within the six (6) years preceding the filing of the Complaint in this action and who did not receive timely compensation for work actually performed, including but not limited to the

7

cleaning of Defendants' vehicles and returning to Platinum's facilities after dropping off the last customer of the day.

Mem. in Supp. at 9-10.

In support of their motion, Plaintiffs submitted the declarations of limousine drivers Paul Arakaki, Isaac Goya, Jonathan DeMotta and Byron Cockett,[1] in addition to the previously submitted declarations of Manankil and Pelayo attached to the complaint.  Accordingly to Plaintiffs, each was required to perform the following work without receiving any minimum, straight or overtime pay: cleaning vehicles, driving to or from customer pickups, waiting for the next customer pickup, running company errands, gassing vehicles, and attending company meetings.  *See* Arakaki Decl. ¶¶ 4-10; Goya Decl. ¶¶ 4-11; DeMotta Decl. ¶¶ 3-11; Cockett Decl. ¶¶ 6-11.  They were also required to incur expenses that were not reimbursed.  Complaint ¶ 37.  Plaintiffs also attach to Arakaki's Declaration an unsigned and undated "Contract Agreement," purportedly drafted by Platinum, which Plaintiffs contend memorializes a common policy requiring drivers to perform uncompensated tasks.  *See* Arakaki Decl., Ex. A.

---

[1]At the hearing, Plaintiffs' counsel informed the Court that Mr. Cockett no longer wishes to participate in this litigation.

8

Plaintiffs also move for partial summary judgment on their overtime claims for certain workweeks and ask the Court to award $820.78 to Pelayo and $783.04 to Manankil under the FLSA.

Defendants move to compel arbitration with Manankil and potential collective members Goya and DeMotta, and ask the Court to dismiss their claims because written arbitration agreements bar this action.  Defendants also seek summary judgment on all claims, except for Pelayo and Manankil's claim for overtime payments under the FLSA.  They argue that the Court should grant them summary judgment on: (1) Plaintiffs' minimum wage claims because Defendants paid Plaintiffs more than $7.25 for each hour worked; (2) Plaintiffs' HRS § 388-6 and unjust enrichment claims because they paid Plaintiffs exactly what they agreed to pay; and (3) Plaintiff Boreliz's overtime claims because he never worked more than 40 hours in a given workweek.

## DISCUSSION

The Court first addresses Plaintiffs' Motion to Certify and then turns to Defendants' Motion to Compel Arbitration.

## I.     Plaintiffs' Motion to Certify Collective

Pursuant to the FLSA § 216(b) and HRS § 388-11(a), Plaintiffs seek an order conditionally certifying a collective and authorizing facilitated notice to all

persons employed or formerly employed by Platinum within the three years

preceding this action, who did not receive full compensation under the FLSA.

Plaintiffs also request to serve as designated representatives pursuant to Section

388-11(a) and for an order authorizing facilitated notice to all persons employed or

formerly employed by Platinum within the six years preceding the Complaint in

this action, whose earned wages were retained in violation of Section 388-6.

### A.   Collective Actions Under the FLSA

An employee may initiate a collective action on behalf of him/herself and

other similarly situated employees under the FLSA.  29 U.S.C. § 216(b).  If the

court finds that the named and prospective plaintiffs are "similarly situated," it has

the discretion to authorize those named to send notice to all of the potential

plaintiffs and may set a deadline for those plaintiffs to "opt-in" to the suit.

*Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 989 (C.D. Cal. 2006).  Those

deciding to "opt-in" must "consent in writing."  29 U.S.C. § 216(b).

The FLSA itself does not define the term "similarly situated."  A number of

courts in this Circuit have adopted a two-step approach for making this

determination under § 216(b).  *See, e.g., Coates v. Farmers Group, Inc.*, 2015 WL

8477918, at *6-*8 (N.D. Cal. Dec. 9, 2015); *Fetrow–Fix v. Harrah's*

*Entertainment*, Inc., 2011 WL 6938594 (D. Nev. 2011).  The two-step approach

involves notification to potential class members of the representative action followed by a final "similarly situated" determination after discovery is completed. At the first "notice stage," the court relies "primarily on the pleadings and any affidavits submitted by the parties" [to decide] "whether the potential class should be given notice of the action." *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004). A more lenient standard generally applies at this initial stage because a court typically has "minimal evidence" with which to make its determination. *See Mooney v. Aramco Services, Co.*, 54 F.3d 1207, 1213-14 (5th Cir .1995), overruled on other grounds by *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 90-91 (2003). At the initial stage, a plaintiff need only make substantial allegations that the putative class members were subject to a single decision, policy or plan that violated the law. *See Coates*, 2015 WL 8477918, at *8 ("In considering whether the lenient notice-stage standard has been met in a given case, courts bear in mind two evidentiary issues. First, a plaintiff need not submit a large number of declarations or affidavits to make the requisite factual showing that class members exist who are similarly situated to the plaintiff. A handful of declarations may suffice."); *Benedict v. Hewlett-Packard Co.*, 2014 WL 587135, at *5 (N.D. Cal. Feb. 13, 2014) ("The standard for certification at this stage is a lenient one that typically results in certification. It is met by a showing that

11

plaintiffs were subject to the same FLSA exemption classification and performed similar job duties. . . . Plaintiffs need not conclusively establish that collective resolution is proper, because a defendant will be free to revisit this issue at the close of discovery.") (citations omitted).

At the second stage of the two-step inquiry, the party opposing certification may move to decertify the collective once discovery is complete. *See Escobar v. Whiteside Constr. Corp*., 2008 WL 3915715, at *3 (N.D. Cal. Aug 21, 2008) ("Certification is called 'conditional' during the first stage because the opposing party could always (successfully) move for decertification."). At that point, "the court may decertify the class and dismiss the opt-in plaintiffs without prejudice." *Leuthold*, 224 F.R.D. at 467. It is at the second stage that the Court makes a factual determination about whether the plaintiffs are actually similarly situated by weighing such factors as: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations." *Id.*

## 1.   <u>Applicable Standard</u>

In the instant case, in which discovery is nearing closure and the factual record before the Court is substantial, the parties dispute the level of scrutiny the

Court should apply to the certification analysis.  Plaintiffs urge the Court to apply the lenient notice-stage standard, while Platinum seeks application of an "intermediate approach" employed by other district courts under similar circumstances.  Under the so-called "intermediate approach," where the parties have conducted discovery, courts will consider all the evidence before it and apply a heightened standard in making a determination on certification.  *See Bouaphakeo v. Tyson Foods, Inc.,* 564 F. Supp. 2d 870, 893 (N.D. Iowa 2008); *Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D. Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification.").

The district court in *Luksza v. TJX Companies, Inc*., 2012 WL 327704 (D. Nev. Aug. 8, 2012), adopted the intermediate approach where the parties had four months to engage in pre-certification discovery, during which time:

> all seven named and opt-in Plaintiffs have been deposed; four Rule 30(b)(6) depositions of Defendant's corporate representatives have been conducted; several discovery requests have been served and responded to, resulting in the production of nearly 5,000 pages of documents; and sworn declarations from 20 other Shift Supervisors at the Las Vegas distribution centers have been collected.

13

*Luksza*, 2012 WL 327704, at *8.  The *Luksza* court decided to "review Plaintiffs' allegations and affidavits in conjunction with the evidence obtained through discovery and apply a heightened standard," *id.*, reasoning as follows:

> Although it is not the role of the Court at this stage of the proceedings to decide the case on the merits, *White v. MPW Indus. Servs., Inc.*, 236 F.R.D. 363, 368 (E.D. Tenn. 2006), the Court has "a responsibility to assure that there is some factual basis for plaintiffs' claims of class-wide discrimination before judicial approval of the sending of notice is granted." *Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991).

*Luksza*, 2012 WL 327704, at *8-*9.

Here, the Court determines that application of the intermediate standard is consistent with similar decisions within this Circuit upon a comparably developed evidentiary record.  *See, e.g., Luksza*, 2012 WL 327704; *Fetrow–Fix v. Harrah's,* 2011 WL 6938594 (D. Nev. Dec. 30, 2011); and *Hinojos v. Home Depot,* 2006 WL 3712944, (D. Nev. Dec. 1, 2006).  Substantial discovery has taken place and has actually been presented to the Court–between the pending cross-motions for partial summary judgment, the motion to compel arbitration, and the motion for conditional certification, the Court has carefully reviewed no fewer than 18 party declarations and 28 exhibits.  *See* Dkt. Nos. 63, 68, 70, 85, 87, 88, 91, and 97.  By agreement of the parties, the discovery deadline was extended from December 11, 2015 until January 12, 2016, *see* dkt. no. 76, a mere two weeks away, and although

14

discovery is not quite closed, there is a sufficient evidentiary record to determine whether this action can be managed on a collective basis. *See Hinojos*, 2006 WL 3712944, at *2. Indeed, it is likely that, without the well-developed record, the parties would not have been in a position to file their motions for summary judgment contending that they are entitled to judgment as a matter of law on various counts. Given the extent of the discovery that has been conducted and set forth in the voluminous motions, it would be irresponsible for this Court to consider mere allegations and conclusions supporting Plaintiffs' claims that they are similarly situated to the putative class, a process typical of initial stage certification, while ignoring the factual evidence suggesting they are not. *See Fetrow–Fix v. Harrah's,* 2011 WL 6938594, at *8.

The state of the present case is factually distinguishable from that of the recently decided, *Coates v. Farmers Group, Inc*., 2015 WL 8477918 (N.D. Cal. Dec. 9, 2015), in which the intermediate approach was rejected because "discovery [was] not near completion." *Coates,* 2015 WL 8477918, at *8. The *Coates* court, in turn, distinguished cases that properly applied the intermediate or "heightened standard" because the factual record before the court was extensive, and –

> discovery has taken place on whether similarly situated plaintiffs may exist. *See Creely v. HCR ManorCare, Inc*., 789 F. Supp. 2d 819, 822 (N.D. Ohio 2011) (finding that, because

15

> the parties have conducted limited discovery on the collective action claims, "it is appropriate to require Plaintiffs to make a modest 'plus' factual showing that there is a group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices"); *McClean v. Health Sys., Inc.*, No. 11-03037-CV-S-DGK, 2011 WL 6153091, at *4 (W.D. Mo. Dec. 12, 2011) (applying intermediate standard from *Creely* after discovery commenced); *Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497-98 (D.N.J. 2000) (using "stricter standard" when 100 potential plaintiffs had already opted in); *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996) (rejecting need for additional discovery when "the facts before the Court are extensive").

*Coates,* 2015 WL 8477918, at *7. In contrast to the landscape in *Coates*, the Court here finds no risk of an incomplete factual record regarding whether putative members are similarly situated. Certainly, the rationale for applying the distinct standards embedded in the two-step approach is not well-served under these particular circumstances.

> Courts have emphasized that a fairly lenient standard is used at the notice-stage step because a court does not have much evidence at that point in the proceedings—just the pleadings and any declarations submitted. In contrast, at the second step, a stricter standard is applied because there is much more information available, "which makes a factual determination possible." *Vasquez v. Coast Valley Roofing, Inc.,* 670 F. Supp. 2d 1114, 1123 (E.D. Cal. 2009); *see also Labrie v. UPS Supply Chain Solutions, Inc.*, No. C 08–3182 PJH, 2009 WL 723599, at *4 (N.D. Cal. Mar. 18, 2009) (noting that the first step "is characterized by a fairly lenient standard, necessitated by the fact that not all discovery will have been completed at the time

16

of the motion," while, at the second step, "the court engages in a more stringent inquiry into the propriety and scope of the collective action" because "discovery is complete and the case is ready to be tried").

*Benedict v. Hewlett-Packard Co*., 2014 WL 587135, at *6.

Finally, bearing in mind that a goal of virtually every collective action is the promotion of judicial economy, the Court determines that it need and should not avail itself of the two-step process in the present case.  *See Basco v. Wal-Mart Stores, Inc*., 2004 WL 14977009 at *5 (E.D. La. July 2, 2004) ("Because the aim of collective actions is to promote judicial economy, and substantial discovery has already been undertaken such that the Court can make an educated decision as to whether certifying this matter as a collective action would survive the decertification process, the ends of judicial economy require the Court to make that inquiry at this stage.  To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources for all parties involved.").

Accordingly, the Court opts to apply the intermediate approach to determine whether Plaintiffs present sufficient evidence that they were victims of a common policy or practice that violated the FLSA.

## 2.   Plaintiffs Are Not Similarly Situated

In determining whether Plaintiffs have met their burden of showing that they are similarly situated to the putative class members, the Court has reviewed Plaintiffs' allegations and affidavits, in conjunction with the evidence obtained through discovery, and applies a heightened standard consistent with the intermediate approach.  The Court considers several factors, including: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations.

> In order for the members of the proposed class to be similarly situated under section 216(b), plaintiffs must show "similarity among the individual situations" and "a factual nexus which binds the named plaintiffs and the potential class members together as victims of a particular alleged policy or practice." *Bonilla v. Las Vegas Cigar Co*., 61 F. Supp. 2d 1129, 1138 n.6 (D. Nev. 1999).  As a result, plaintiffs "cannot proceed in a collective action if the action relates to other specific circumstances personal to the plaintiff rather than any generally applicable policy or practice."  *Id*., quoting *Crain v. Helmerich and Payne Int' Drilling Co.*, No. 92-0043, 1992 WL 91946, at *2 (E.D. La. Apr. 16, 1992) and *Burt v. Manville Sales Corp*., 116 F.R.D. 276, 277 (D. Colo. 1987).

*Hinojos*, 2006 WL 3712944, at *2.  While it is not the role of the Court at this stage to decide the case on the merits, the disparate employment circumstances of the individual Plaintiffs, and the various defenses available to Platinum with

respect to the individual Plaintiffs, evidence no compelling or unifying nexus that would lend itself to a collective action approach.  As such, neither certification nor issuance of notice is appropriate.

In support of their motion, Plaintiffs Pelayo and Manankil submit personal declarations, together with those from four prospective class members, in an attempt to demonstrate that all were regularly required to work in excess of forty hours in a seven-day work week, were paid only straight wages, without regard to the minimum wage requirement, and were denied premium overtime wages.[2] These same declarations assert that Plaintiffs and potential collective members were required to perform work, including but not limited to cleaning vehicles, driving to or from customer pickups, waiting for the next customer pickup, running company errands, gassing vehicles, and attending company meetings, without receiving any minimum, straight or overtime pay for these tasks.  *See* Decls.

The source of the common policy or plan is not clear.  Arakaki, for example, relies on a "Contract Agreement" that is neither signed nor dated (but was presumably created by Platinum).  Even if somehow binding, Platinum argues that

_____

[2]Each of the four declarations state "[t]o my knowledge, no limousine driver employed by Platinum Limousine was ever paid their premium overtime rate for overtime hours that they worked" and "[t]o my knowledge, all limousine drivers employed by Platinum were hourly employees by agreement yet none were paid for completing such tasks."  *See* Arakaki, Goya, DeMotta, and Cockett Decls.

there is no evidence that paragraph 1 of the Contract Agreement ("Drivers are expected to be at the office 1 hour prior to their run. . .") was enforced or establishes a failure to compensate, or that paragraph 5 ("Cars must be cleaned after run. . .") indicates that Platinum required the limousine drivers themselves to perform the cleaning or evidences an intent to avoid compensation.  Platinum also points to (1) the inconsistent allegation in the Second Amended Complaint that the policies at issue "were communicated to Platinum employees orally," not through a written "Contract Agreement;" *see* ¶ 24, and (2) to a different "Contract Agreement" signed and dated by DeMotta, which does not include the same language regarding overtime as the one submitted by Arakaki.  *See* Ex. A at 13 (2/7/12 DeMotta Agreement), attached to Platinum CSOF.  Indeed, these inconsistencies tend to show a lack of common decision, policy or plan.

According to Tsuneyoshi, Platinum paid for different jobs in different ways.  It paid for some jobs at an hourly rate based on the actual amount of time it took to perform the job.  Platinum paid for other jobs by task.  For these jobs, Platinum allotted a specific amount of time to the task, and paid the employee his/her hourly rate for the allotted time, regardless of how long the task actually took to perform.  Tsuneyoshi Decl. ¶¶ 4, 6.  This assertion alone, which Plaintiffs do not dispute, infinitely complicates and individualizes both the merits and damages analysis:

which employees performed task-based jobs, the extent to which each performed

such jobs, what each was told regarding those jobs and how what each was told

relates to applicable written policies is simply the beginning.  It is virtually

impossible to perform the type of wage and overtime analysis urged by Plaintiffs

without sorting through each employee's work history, time records and other

documentary evidence, which are not likely to share a common origin.

Indeed, because of the discovery posture of this case, the Court need not

guess.  Despite Plaintiffs' allegation that Platinum had "a consistent policy and

practice" of violating the FLSA, and related provisions of state law, they each

present evidence of different types of violations that necessitate individualized

proof.  As Platinum aptly notes, for instance, Plaintiffs' declarations and

allegations necessitate cross-examination of each individually regarding whether

an employee worked overtime or performed off-the-clock work; whether each

employee accurately recorded time; whether the particular activities were

compensable and to what extent; and whether the time spent on these activities fell

within the *de minimis* exception to the FLSA.  These "are the sorts of [issues and]

defenses that must, by their nature, be individualized." *Smith*, 2007 WL 2385131,

at *8; *accord Basco*, 2004 WL 1497709, at *8; *see also Reed v. Cnty. of Orange*,

266 F.R.D. 446, 449 (C.D. Cal. 2010) ("It is not sufficient for the plaintiffs'

21

evidence to merely "successfully engage" the competing evidence offered by the

defendant, rather, it is plaintiffs' burden to provide substantial evidence to

demonstrate that they are similarly situated."); *Smith v. Micron Electronics, Inc.,*

2005 WL 5336571, at *2 (D. Idaho. Feb. 4, 2005) ("An allegation of an

overarching policy is generally insufficient; plaintiffs must produce substantial

evidence of a single decision, policy or plan.  Substantial evidence is such

reasonable evidence as reasonable minds might accept as adequate to support a

conclusion even if it is possible to draw two inconsistent conclusions from the

evidence.") (citations and quotations omitted).  Merely relying on the fact that

Plaintiffs are limousine drivers to support collective treatment where Plaintiffs'

factual circumstances differ depending on their assignment, status, and years of

service falls short of demonstrating that Plaintiffs are similarly situated.  As one

court observed, while "[P]laintiffs' claim that they were illegally denied overtime

pay is ostensibly a common legal nexus giving rise to a common injury, that

commonality is illusory because the underlying claims are disparate." *Smith v. T-*

*Mobile USA, Inc.*, 2007 WL 2385131, at *3 (C.D. Cal. Aug. 15, 2007).

In evaluating fairness and procedural considerations, courts consider

whether collective treatment will achieve the primary objectives of a § 216(b)

collective action: "(1) to lower costs to the plaintiffs through the pooling of

22

resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Moss v. Crawford & Co.*, 201 F.R.D. 398, 410 (W.D. Pa. 2000) (citing *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  A court must also determine whether it can coherently manage the class in a manner that will not prejudice any party.  Permitting this case to proceed as a collective action is neither efficient nor economical.  Given Plaintiffs' varying factual and employment settings and records, and the lack of substantial evidence that Plaintiffs were subjected to a uniform decision, policy or practice, the fact finder will have to make unique determinations as to each, and any claims and defenses must be made, explored, and tested on an individualized basis.  Proceeding collectively in this case would likely be unmanageable, chaotic, and counterproductive.  *See T–Mobile*, 2007 WL 2385131, at *8.

Upon consideration of (1) the disparate factual and employment settings of the individual Plaintiffs; (2) the various defenses available to Defendants with respect to the individual Plaintiffs; and (3) fairness and procedural considerations,

the Court determines that certification is not warranted.[3]  Having reviewed the

declarations and other exhibits, the Court is not persuaded that Plaintiffs have

established that the putative class members were subjected to a common decision,

policy or plan that violated the FLSA.  The Court therefore concludes that it would

not serve the interests of judicial economy to certify this collective action.  The

motion is DENIED.

### B.    HRS Chapter 388 Class Certification

Under HRS § 388-11(a), an action "by an employee to recover unpaid wages

may be maintained in any court of competent jurisdiction by any one or more

employees for and in behalf of oneself or themselves, or the employee or

employees may designate an agent or representative to maintain the action."

Plaintiffs ask the Court to apply the two-tier approach for FLSA collective

---

[3]Even if the Court employed the more lenient notice-stage standard, it would be difficult to conclude that these Plaintiffs are similarly situated.  The individualized analysis required would inevitably lead to an eventual decertification.  Courts consistently rule that where FLSA claims require significant individual determinations and considerations, they are inappropriate for conditional certification under section 216(b).  *See, e.g., Mooney v. Aramco Servs.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995); *West v. Border Foods, Inc.,* 2006 WL 1892527, at *3 (D. Minn. July 10, 2006); *Ray v. Motel 6 Operating Limited P'ship*, 1996 WL 938 231, at *4-5 (D. Minn. Mar. 18, 1996).

certification to their HRS § 388-11 class action, but acknowledge that they could

seek certification under Federal Rule of Civil Procedure Rule 23.[4]

As discussed in the preceding section, the Court denies Plaintiffs' request for

certification of a collective action under the two-tier FLSA approach.   The Court

now employs an alternative analysis to determine if the result would be any

different under Rule 23.  The standard is well-established.  *See* Fed.R.Civ.P. 23;

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997); *Gurrobat v. HTH*

*Corp.*, 133 Hawaiʻi 1, 323 P.3d 792 (2014).

Under Rule 23(a),

> One or more members of a class may sue or be sued as
> representative parties on behalf of all members only if:
>
>> (1) the class is so numerous that joinder of all members is
>> impracticable;
>>
>> (2) there are questions of law or fact common to the
>> class;
>>
>> (3) the claims or defenses of the representative parties are
>> typical of the claims or defenses of the class; and
>>
>> (4) the representative parties will fairly and adequately
>> protect the interests of the class.

---

[4]Plaintiffs also maintain that no court has rejected conditional certification of § 388-6 claims.
*See* Plaintiffs' Reply at 3-4.

These requirements are known as: numerosity, commonality, typicality, and adequacy of representation. *See Poulos v. Caesars World, Inc.*, 379 F.3d 654, 664 (9th Cir. 2004). Plaintiffs must meet each of the Rule 23(a) requirements.

To satisfy the numerosity requirement, a proposed class must be "so numerous that joinder of all members is impracticable." That is clearly not the case here, where fewer than 10 potential Plaintiffs are present. In general, courts find the numerosity requirement satisfied when a class includes at least 40 members. *See EEOC v. Kovacevich "5" Farms*, 2007 WL 1174444, at *21 (E.D. Cal. Apr.19, 2007). Although the Court may have discretion to certify a class of fewer than 40 or fewer than even 20 members, it declines to do so here. *See, e.g., Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980) (A class of 15 "would be too small to meet the numerosity requirement." ); *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003) ("The Supreme Court has held fifteen is too small. The certification of those classes [of seven, nine, and ten members] must be vacated on numerosity grounds."); *Villon v. Marriott Hotel Servs., Inc.*, 2011 WL 2160483, at *15 (D. Haw. May 31, 2011) ("[I]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members.") (quoting *Rannis v. Recchia*, 380 Fed. Appx. 646, 651 (9th Cir. 2010)).

26

In addition to this shortcoming, Plaintiffs cannot make the requisite showing of predominance and superiority under Rule 23(b).[5]  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc*., 521 U.S. at 623.

---

[5]Before a class may be certified, Plaintiffs must show that they qualify under at least one subsection of Rule 23(b):

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> > (D) the likely difficulties in managing a class action.

Unlike Rule 23(a)(2), the predominance requirement does not look at the mere existence of common issues.  The common issues must be "a significant aspect of the case and they can be resolved for all members of the class in a single adjudication."  *Villon*, 2011 WL 2160483, at *17 (citation omitted).  Common issues may not be resolved for each member of the proposed class in a single adjudication here for the reasons set forth in the preceding section – the nature and substance of the work performed by each Plaintiff, the information that was conveyed to each both orally and in writing, among many other factors, varies widely.

Finally, upon review of Rule 23(b)(3)'s non-exhaustive list of factors that courts should consider in reviewing superiority, the Court finds that the applicable factors do not weigh in favor of class certification.

In sum, whether viewed through the lens of a Rule 23 analysis, or through the two-stage process common to collective actions brought under the FLSA, Plaintiffs' motion for class certification of their HRS § 388-6 claim is DENIED.

## II.   **Platinum's Motion to Compel Arbitration**

Defendants move to compel arbitration of the claims brought by Manankil, and by putative plaintiffs DeMotta and Goya, pursuant to employment agreements that contain the following arbitration provision:

28

11.   <u>Arbitration and Equitable Relief</u>.

(a)   <u>Arbitration</u>.  Except as provided in subsection (b) below, I agree that any dispute, claim or controversy concerning my employment or the termination of my employment or any dispute, claim or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration to be held in [Honolulu], Hawaii in accordance with the rules then in effect of the American Arbitration Association.  The arbitrator may grant injunctions or other relief in such dispute or controversy.  The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration.  Judgment may be entered on the arbitrator's decision in any court having jurisdiction.  The Company and I shall each pay one-half of the costs and expenses of such arbitration, and each of us shall separately pay our counsel fees and expenses.

Platinum Ex. A (2/7/12 Manankil, DeMotta, and Goya Agreements).

As a preliminary matter, the Court will not, pursuant to Federal Rule of Civil Procedure 37, bar Defendants from relying on these agreements based upon the timing of the instant motion to compel.  Defendants have not waived arbitration as an affirmative defense, *see* Answer ¶ 11, and the Court is satisfied that counsel disclosed the arbitration agreements and filed the instant motion promptly upon becoming aware of their existence.  Accordingly, Rule 37 sanctions for failure to timely disclose the Manankil, Goya, and DeMotta agreements are not warranted under the circumstances.

A.     __Applicable Law__

In determining whether to compel arbitration, a district court may not review the merits of the dispute; rather, "the district court's role is limited to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue.  If the answer is yes to both questions, the court must enforce the agreement."  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)); *see also Momot v. Mastro*, 652 F.3d 982, 986 (9th Cir. 2011) ("Because arbitration is fundamentally a matter of contract, the central or primary purpose of the [Federal Arbitration Act ("FAA")] is to ensure that private agreements to arbitrate are enforced according to their terms.") (citations omitted).

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract."  9 U.S.C. § 2; *see also Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1126 (9th Cir. 2013) ("With limited exceptions, the [FAA] governs the enforceability of arbitration agreements in contracts involving interstate commerce.").  Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in

30

favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Generally, "the federal policy in favor of arbitration does not extend to deciding questions of arbitrability," that is, the question "who decides whether a claim is arbitrable*." Oracle Am., Inc. v. Myriad Group A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (emphasis omitted). "[G]ateway questions of arbitrability, such as whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy," are issues for the court and not the arbitrator to decide. *Momot*, 652 F.3d at 987 (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-85 (2002)). But parties may agree to arbitrate the question of arbitrability. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter. Significantly, as discussed more fully below, binding Circuit precedent requires courts to allow the arbitrator to determine arbitrability where an agreement to arbitrate incorporates the rules of the American Arbitration Association.

31

**B.     The Parties' Incorporation of AAA Rules Dictates Allowing the Arbitrator to Determine Questions of Arbitrability**

Plaintiffs argue that the Court should not compel arbitration because Hawai'i law governs the employment agreements—not the FAA—and that under Hawai'i law, this Court "shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."  Mem. in Opp. at 2 (quoting HRS § 658A-6(b)).  Plaintiffs rely on the choice of law provision in Paragraph 12(a), which states:

> 12.   <u>General Provisions</u>.
>
> (a)   <u>Governing Law; Consent to Personal Jurisdiction</u>.  THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF THE STATE OF HAWAII WITHOUT REGARD FOR CONFLICTS OF LAWS PRINCIPLES.  I HEREBY EXPRESSLY CONSENT TO THE PERSONAL JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF HAWAII FOR ANY LAWSUIT FILED THERE AGAINST ME BY THE COMPANY CONCERNING MY EMPLOYMENT OR THE TERMINATION OF MY EMPLOYMENT OR ARISING FROM OR RELATING TO THIS AGREEMENT.

Platinum Ex. A (2/7/12 Manankil, DeMotta, and Goya Agreements).  Despite the seemingly broad language cited by Plaintiffs, Paragraph 12's choice of law provision does not expressly state that Hawaii law governs *the question of arbitrability*.  The distinction is significant.

Federal law governs the question of arbitrability by default where, as here, the employment agreements are covered by the FAA,[6] *see Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc*., 473 U.S. 614, 626 (1985), and the parties have not clearly and unmistakably designated that nonfederal arbitrability law applies, *see Cape Flattery Ltd. v. Titan Maritime*, 647 F.3d 914, 921 (9th Cir. 2011).   None of the employment agreements at issue "clearly and unmistakably" indicate that Hawaii's law of arbitrability should apply – each "says nothing about whether [Hawaii's] law governs the question whether certain disputes are to be submitted to arbitration in the first place."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015).  In *Cape Flattery*, the Ninth Circuit concluded that an arbitration provision stating "[a]ny dispute arising under this Agreement shall be settled by arbitration . . . in accordance with the English Arbitration Act 1996," was

---

[6]Plaintiffs are not seamen, railroad employees, or otherwise engaged in the movement of goods in interstate commerce—specific classes of workers exempt from the FAA—nor have they alleged as much.  *See* 9 U.S.C. § 1; *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 480-486 (S.D.N.Y. 2008) (passenger car service drivers not exempt from FAA); *see also Rojas v. TK Commc'ns*, 87 F.3d 745, 748 (5th Cir. 1996) ("'The exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are.'") (quoting *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592, 600-01 (6th Cir. 1995)); *Tran v. Texan Lincoln Mercury, Inc.*, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007) ("[W]orkers who are not engaged in the movement of goods in interstate commerce as seamen and railroad workers cannot be excluded from the FAA under Section 1 of the Act. . . .  [A] transportation worker is someone who works in the transportation industry—an industry whose mission it is to move goods.").

33

"ambiguous concerning whether English law also applies to determine whether a given dispute is arbitrable in the first place."  647 F.3d at 921.  The employment agreements here are similarly "ambiguous" because they do not expressly state that Hawaiʻi law governs the question of arbitrability.  Accordingly, under Ninth Circuit precedent, federal arbitrability law applies.

In addition, the Ninth Circuit recently held in *Brennan* that incorporation of the AAA rules in an at-will employment contract constitutes "clear and unmistakable" evidence that the parties intended to delegate the arbitrability question to an arbitrator:

> In *Oracle America, Inc. v. Myriad Group A.G.,* 724 F.3d 1069 (9th Cir. 2013), we observed that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Id.* at 1074.  We found this consensus persuasive in holding that incorporation of the UNCITRAL rules—which contain a jurisdictional provision "almost identical" to the one in the AAA rules—constituted "clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability." *Id.* at 1074-75.  Now that the question regarding incorporation of the AAA rules is squarely before us, we hold that incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability.

*Brennan*, 796 F.3d at 1130.

Here, the arbitration clause at issue unambiguously incorporates the commercial arbitration rules of AAA. The AAA rules delegate enforceability questions to the arbitrator.[7] Applying binding authority, it is clear and unmistakable that the Manankil, DeMotta, and Goya employment agreements intended to delegate the question of arbitrability to an arbitrator.[8] Accordingly, the Court does not reach Plaintiffs' additional arguments (*e.g.* regarding procedural and substantive unconscionability) because they are for the arbitrator to decide in light of the parties' delegation of authority. *See Brennan*, 796 F.3d at 1133-34.

Defendants' motion to compel arbitration is granted.

---

[7] *See* American Arbitration Association Employment Arbitration Rules & Mediation Procedures, Rule 6 ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."); *see also Brennan*, 796 F.3d at 1130 (Referencing "AAA arbitration rules, one of which provides that the 'arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the . . . validity of the arbitration agreement.'")

[8] *Brennan* explained that its holding "should not be interpreted to require that the contracting parties be sophisticated or that the contract be 'commercial' before a court may conclude that incorporation of the AAA rules constitutes 'clear and unmistakable' evidence of the parties' intent." 796 F.3d at 1130. While limiting its holding to the facts before it (an at-will employment contract between an experienced businessman and a financial institution), the Ninth Circuit acknowledged that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties or to commercial contracts." *Id.* at 1131 (citing *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Republic of Arg. v. BG Grp. PLC*, 665 F.3d 1363, 1371 (D.C.Cir.2012); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 10–12 (1st Cir. 2009)).

## <u>CONCLUSION</u>

On the basis of the foregoing, the Court DENIES Plaintiffs' Motion to

Conditionally Certify a Collective and for an Order of Notice to the Class, and

GRANTS Defendants' Motion to Compel Arbitration.  The Court will hold the

parties' pending motions for summary judgment in abeyance pending further

settlement discussions directed by a concurrently-filed Entering Order.

IT IS SO ORDERED.

DATED:  December 30, 2015 at Honolulu, Hawai'i.



_____
Derrick K. Watson
United States District Judge

---

*Pelayo, et al. v. Platinum Limousine Services, Inc., et al.*; Civ. No. 15-00023
DKW-BMK; **ORDER (1) DENYING PLAINTIFFS' MOTION TO
CONDITIONALLY CERTIFY A COLLECTIVE AND FOR AN ORDER OF
NOTICE TO THE CLASS; AND (2) GRANTING DEFENDANTS' MOTION
TO COMPEL ARBITRATION**